UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL LEE, *Plaintiff*, <br><br> v. <br><br> RICHARD GOLASZEWSKI and STEPHEN SWENTZEL, *Defendant*. | ) <br> ) <br> ) CASE No. 3:23-cv-400 (OAW) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**RULING ON DEFENDANTS' MOTION TO TRANSFER**

**THIS ACTION** is before the court upon Defendants' Motion to Dismiss, or in the Alternative, To Transfer to the Southern District of New York ("Defs.' Mot."). ECF No. 11. The court has reviewed the motion itself, Plaintiff's Memorandum of Law in Opposition ("Pl.'s Opp'n), ECF No. 16, and Defendants' Reply Memorandum of Law in Support ("Defs.' Reply"), ECF No. 21. For the reasons discussed herein, the motion is **GRANTED** as to the request that this matter be transferred.

I.     **BACKGROUND**

Plaintiff's claims arise out of a dispute between the parties regarding a joint venture and/or partnership agreement.[1] *See* Compl. 2, ECF No. 1-1 [hereinafter, "Compl."]. Plaintiff and Defendants met at 17Capital, an international private equity firm in New York. *See id.* ¶ 10; Defs.' Mot. 1. Plaintiff sought to "utilize the relationships he had developed" throughout his career to start a new partnership venture in the private equity space. *See* Compl. ¶ 12. The parties disagree as to what happened next.

---

[1] Plaintiff's complaint filed with the Superior Court of Connecticut uses the terms "joint venture" and "partnership" interchangeably in describing the relationship between the parties. The court adopts such usage without expressing any opinion as to the validity or the existence of this entity.

1

Plaintiff claims that when he proposed this venture to Defendants, all three agreed to enter into the partnership venture. *Id.* ¶ 13. This venture would take on multiple names: "Project Buffalo Point," "Project Fremen," and "Project Candle." *Id.* ¶ 1. Plaintiff further alleges that he took a "quarterback" role in exploring strategic partners for Project Buffalo Point. *Id.* ¶ 14. In that role, Plaintiff claims to have had multiple discussions to seek out potential strategic partners for Project Buffalo Point. *See id.* ¶ 15. One such potential partner was Hunter Point Capital, a New York private equity firm. *Id.* ¶ 16. In various offices, restaurants, and venues throughout New York, Plaintiff claims to have had discussions with various executives of Hunter Point Capital, including its President (Michael Arpey) and CEO (Avi Kalichstein), to explore the possibility that Project Buffalo Point and Hunter Point Capital might "team up." *Id.* ¶¶ 16, 20, 21.

The discussions regarding this partnership venture had developed to such an extent, Plaintiff argues, that the three partners—Plaintiff and two Defendants—retained the legal services of Michael Sabin, an attorney based in New York, practicing in the Manhattan office of the law firm Clifford Chance. *See* Compl. ¶ 24; Defs.' Mot. 6. Plaintiff states that Attorney Sabin was retained to assist in negotiating the Plaintiff's and Defendants' separation from 17Capital, and their strategic partnership with Hunter Point Capital. *See* Compl. ¶¶ 24–26. According to Plaintiff, conversations with Hunter Point continued to progress in various restaurants and bars throughout New York. *See* Compl. ¶ 37, 45. Plaintiff claims that, at one point, Hunter Point Capital had valued that the three partners would bring in a cash flow of around $220 million during the first five years and $848 million in the first ten years. *Id.* ¶ 41.

Plaintiff claims that around the time Hunter Point Capital noted the "vast financial benefits" of the partnership between Project Buffalo Point and Hunter Point Capital, Defendants "began to orchestrate a scheme to oust Mr. Lee." *Id.* ¶ 41.  In the following days, Defendants and Attorney Sabin discussed their plan to oust Plaintiff.  *Id.* ¶¶ 48–52.  This culminated into a phone call between Defendants and Plaintiff on May 25, 2022, wherein Plaintiff was notified that he had been ousted from the partnership.  *Id.* ¶ 53.

Defendants' account of the events is different.  Defendants claim that they did not agree "to enter into a venture, partnership, or agreement of any kind with Plaintiff."  Defs.' Mot. 3.  Rather, Defendants assert that they told Plaintiff "not to use their names when he went job hunting."  *Id.* at 4.  Defendants state that Plaintiff's initial contact with Hunter Point Capital was without their knowledge or permission, and was contrary to their previous warning .  *Id.*  However, Defendants concede that they became interested in seeking employment at Hunter Point Capital after discussions with Michael Arpey.  *See id.* at 5.  Defendants state that they continued to have multiple meetings with Hunter Point across Manhattan to discuss a potential employment opportunity.  *See id.* at 7.

Defendants also agree that they, with Plaintiff, jointly retained the legal services of Michael Sabin—and Sabin's firm, Clifford Chance—for the purpose of facilitating a move away from 17Capital.  *See id.*  Contradictory to Plaintiff's account of events, Defendants state that this joint retention of counsel and Plaintiffs' role as "representative" was "purely for administrative purposes."  *Id.* at 6.  Moreover, Defendants assert that when Plaintiff was terminated from 17Capital, they expressed to Plaintiff their intention to withdraw from joint representation by Michael Sabin and Clifford Chance.  *Id.* at 8.

Finally, Defendants note that they were hired by Hunter Point Capital as "at-will employees" and not as a partnership or business "of any kind." *Id.* They point out that Plaintiff had declined to interview for a fundraising role at Hunter Point Capital and has instead found employment with Oak Hill Advisors, another investment firm in Manhattan. *Id.* Plaintiff allegedly interviewed for this role without Defendants. *Id.*

On March 10, 2023, Plaintiff Daniel Lee filed this complaint in the Superior Court of Connecticut, at its Stamford Judicial District. *See* Compl. Each of the three counts in Plaintiff's complaint pertains to his ouster from the alleged partnership: 1) breach of the partnership agreement; 2) breach of the joint venture agreement; and 3) breach of their fiduciary duty. *See Id.* ¶¶ 59–81. On March 31, 2023, Defendants Richard Golaszewski and Stephen Swentzel timely filed a notice of removal with the court, noting that this court had diversity jurisdiction over the matter. *See* Notice of Removal, ECF No. 1.

## II.    LEGAL STANDARD

When responding to a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). However, a plaintiff need persuade the court only that its factual allegations, if true, constitute a *prima facie* showing of jurisdiction. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84 (2d Cir. 2013) (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196 (2d Cir. 1990). "A prima facie case [of personal jurisdiction] requires nonconclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v.*

4

*MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 186 (2d Cir. 1998)).

"[I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-party inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *see Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (stating the three requirements for personal jurisdiction: (1) properly effectuated service; (2) "statutory basis for personal jurisdiction that renders such service of process effective"; and (3) compliance with "constitutional due process principles").

Pleadings and affidavits should be construed "in the light most favorable to [P]laintiffs, resolving all doubts in their favor." *Dorchester Fin. Sec.*, 722 F.3d at 85. The court will not, however, accept as true "a legal conclusion couched as a factual allegation," *Jazini*, 148 F.3d at 185, nor allegations "controverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). Further, "the breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006).

### III. DISCUSSION

Defendants' arguments are twofold; first, they argue that this case should be dismissed because the court lacks personal jurisdiction over them. *See* Defs.' Mot. 10.

5

Second, they argue that even if the court can exercise personal jurisdiction, it should transfer this case to the Southern District of New York (SDNY) out of convenience of the parties and witnesses, and in the interest of justice. *See id.* at 15. Plaintiffs responds with two related arguments of his own. First, he claims that this court can exercise personal jurisdiction over Defendants. *See* Pl.'s Opp'n 6. He then argues that if this court does not find personal jurisdiction, it should transfer this case to the SDNY, rather than dismissing it. *See id.* at 14.

The court agrees in part with both the defendants and the plaintiff. While this court cannot exercise personal jurisdiction over the defendants, the case shall be transferred to SDNY rather than being dismissed.

**A. Personal Jurisdiction – Connecticut General Statute § 52-59b**

Both parties agree that the operative state statute is Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b(a). Plaintiff argues that the court may exercise personal jurisdiction over the defendants under two provisions of the statute, §§ 52-59b(a)(1) and 52-59b(a)(3). *See* Pl.'s Opp'n 7–10. "In order to find jurisdiction over a nonresident defendant, only one of the provisions of § 52-59b needs to be satisfied." *Hudson Park Invs., LLC v. Chris Anastos, P.E.,* No. X05CV030198484S, 2005 WL 1093001, at *5 (Conn. Super. Ct. Apr. 8, 2005).

1. *Section 52-59b(a)(1)*

Section 52-59b(a)(1) allows courts of Connecticut to exercise personal jurisdiction over "nonresident individuals, who in person or through an agent . . . transacts any business within the state." Conn. Gen. Stat. § 52-59b(a)(1). The phrase "transacts any business within the state" is construed "quite broadly" by the Supreme Court of

6

Connecticut.[2]  *Austen v. Catterton Partners V, LP*, 729 F. Supp. 2d 548, 560 (D. Conn. 2010) (citing to *Zartolas v. Nisenfeld*, 184 Conn. 471, 474 (1981)).  The phrase embraces "a single purposeful business transaction." *Zartolas*, 184 Conn. at 474.  Courts determine whether a defendant's contact has satisfied this requirement by balancing "public policy, common sense, and the chronology and geography of the relevant factors." *Confectionary Arts Int'l, LLC v. CK Prod. LLC*, No. 3:16-cv-2015(JBA), 2018 WL 1141357, at *4 (D. Conn. Mar. 1, 2018) (citing *Harris v. Wells*, 832 F. Supp. 31, 34 (D. Conn. 1993)).  "Courts are instructed to examine the 'nature and quality, rather than the amount of Connecticut contacts to determine whether there was purposeful activity.'"  *Id.* (quoting *Avant Cap. Partners v. Strathmore Dev. Co. Mich, LLC*, No 3:12-cv-1194(VLB), 2013 WL 5435083, at * 3 (D. Conn. Sept. 30, 2013)).

Under this standard, the court finds that Plaintiff has failed to satisfy his burden of establishing the court's personal jurisdiction over the defendants.

Plaintiff's arguments boil down to the following assertions: 1) Defendants entered into an alleged partnership agreement with Plaintiff, who Defendants knew to be a resident of Connecticut; 2) Defendants engaged in continued communication with Plaintiff regarding this partnership; and 3) Defendants traveled to Connecticut to meet with Plaintiff in furthering the partnership.  *See* Pl.'s Opp'n 3.  Each of these arguments emphasizes the central shortcoming of Plaintiff's jurisdictional claim:  Defendants' contact with Connecticut were simply a byproduct of Plaintiff's residence in the state.  The record

---

[2] Before any substantive analysis, the court first notes that Defendants misconstrue the interpretation of this statutory requirement.  While it is true that the phrase "transacts business" is not broadly interpreted, the phrase "transacts *any* business" is indeed understood to be broad.  *Doyle Grp. v. Alaskans for Cuddy*, 146 Conn. App. 341, 350 (2013) ("[Supreme Court of Connecticut] has clarified that the phrase transacts and business in § 52-59b has a broader meaning that the phrase[] transact business in § 33-396." (internal quotations omitted) (citing to *Zartolas*, 184 Conn. at 476)).  Whether Plaintiff has established the court's ability to exercise personal jurisdiction must be reviewed under this broad standard.

does not suggest that Defendants took any "definitive act" which "evinces purposeful availment of the privileges of conducting the subject activity within the forum state," and therefore "invokes the benefits and protections of its laws." *Walshon v. Ballon Stoll Bader & Nadler, P.C.*, 121 Conn. App. 366, 371–72 (2010) (citing *Ryan v. Cerullo*, 282 Conn. 109, 120 (2007)).  Afterall, Plaintiff's cause of action does not deal with Connecticut, but with New York.

All three counts of Plaintiff's claim stem from the alleged breach of a partnership agreement.  *See generally* Compl., Ex. A, ECF No. 1-1.  The record is clear that this partnership, if ever fulfilled, was (or would be) a creature of New York.  Plaintiff and Defendants met at 17Capital, a New York company.  Defs.' Mot. 2–3.  Conversations which led to the conception of this partnership were held in New York.  *See* Decl. of Golaszewskj ¶ 4; Decl. of Swentzel ¶ 4.  Discussions of a strategic partnership between Project Buffalo Point and Hunter Point Capital were held in New York as well.  *See* Decl. of Golaszewskj ¶¶ 10, 16, 26; Decl. of Swentzel ¶¶ 10, 16, 22.  Discussions continued in various restaurants and venues in New York.  *See* Compl. ¶¶ 23, 37, 45.  In seeking legal counsel for their strategic partnership with Project Buffalo Point, Plaintiff and Defendants retained Michael Sabin, a Manhattan-based attorney, who would have been familiar with New York state law.  *See* Compl. ¶ 28; Decl. of Golaszewskj ¶ 22 (noting that the appointment of Sabin was for "efficiency" and to "minimize costs"); Decl. of Swentzel ¶ 18 (same).  Reflecting the New-York-centric nature of this suit, Plaintiff's initial complaint (filed with the Superior Court of Connecticut) references Connecticut only regarding Plaintiff's residence.  *See* Compl. ¶ 7.  The record is clear that the events that gave rise to Plaintiff's claims were in New York, thereby disfavoring the court's exercise of personal

jurisdiction in this case.  See *Rosenblit v. Danaher*, 206 Conn. 125, 140–41 (1988) (ruling against finding of personal jurisdiction where, although plaintiff was a resident of Connecticut, the "large measure" of events that gave rise to the suit occurred in Massachusetts).

Any subsequent mentions of Connecticut are simply "too attenuated" to support finding of personal jurisdiction.  *Statek Corp. v. Coudert Bros. LLP*, No. 3:07-cv-456(SRU), 2018 WL 834227, at *14 (D. Conn. Feb. 12, 2018) (citing *Cerullo*, 282 Conn. at 121).  Plaintiff states, and Defendants do not contest, that Defendants continuously communicated with Plaintiff when he was physically in Connecticut.  See Pl.'s Opp'n 8.  However, these contacts with Connecticut surely were meant to further Project Buffalo Point, a partnership based in New York, and not for Defendants to purposefully avail themselves of the benefits of Connecticut's laws.

Separately, Defendants concede that, in at least one instance, Golaszweski traveled to Connecticut to meet with a Connecticut-based investment firm regarding Project Buffalo Point.  *See id.*  Even if the court finds that this instance of contact with Connecticut constitutes "transacting business," Plaintiff's claims of breaching their partnership agreement, joint venture agreement, and fiduciary duty do not "arise from such activity."  *Walshon*, 121 Conn. App. at 372 (citing *Cerullo*, 282 Conn. at 122–23).  That is to say, the conduct that gave rise to this instant action is not attributable to solicitation of business in Connecticut, but the breakdown in communications regarding a potential partnership or joint venture agreement.  Thus, the court disagrees with Plaintiff's contention that Defendants "surely knew" that working with Plaintiff would subject them to suit in Connecticut.  Pl.'s Opp'n 8.

In sum, the court concludes that Plaintiff has not shown that his "cause of action is sufficiently related to any business transacted . . . in Connecticut" for the court to hold personal jurisdiction over Defendants.  *Statek Corp.*, 2018 WL 834227, at *16.

### 2. Section 52-59b(a)(3)

Pursuant to § 52-59(a)(3), "a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation . . . if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  Conn. Gen. Stat. § 52-59(a)(3).

"The initial inquiry is whether an injury occurred within the state."  *Lis v. Delvecchio*, No. 3:11cv01057(AWT), 2012 WL 3309384, at *4 (D. Conn. Aug. 13, 2012).  The parties each offer different tests to administer: Plaintiff, through citation to authority, suggests the "situs of injury" test, *see* Pl.'s Opp'n 10 (citing to *Delvecchio*, 2012 WL 3309384 at *4), while Defendants argue for the "critical events" test.  *See* Defs.' Mot. 12 (citing to *Hamann v. Carpenter*, No 3:16-cv-501(VAB), 2017 WL 421646, at *3 (D. Conn. Jan. 31, 2017)).

The court finds that it is more appropriate to use the "critical events" test here.[3] This court (*Hon. Alvin W. Thompson, J.*) carefully explained that the situs of injury test is

---

[3] The court further finds that its decision to administer the critical events test is not dispositive of the present ruling.  Even under the situs of injury test, this court could not exercise personal jurisdiction. "[T]he situs of a commercial injury is generally where the plaintiff experiences a loss of business, not where the plaintiff resides, despite the fact that the plaintiff may, while in his home state, subsequently feel the economic impact of the lost business."  *Evergreen Media Holdings, LLC v. Warren*, 105 F. Supp. 3d 192, 199 (D. Conn. 2015).  In the present case, the business in question was located in New York.

10

more applicable to the unique nature of "trademark law in the fast-developing world of the Internet." *Delvecchio*, 2012 WL 3309384, at *4 (citing to *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). In a more traditional commercial tort action such as this, courts of the District of Connecticut use the critical events test. *See Hamann*, 2017 WL 421646, at *3 (dealing with a contractual dispute); *Bross Utils. Servs. Corp. v. Aboubshait*, 489 F. Supp. 1366, 1374–75 (D. Conn. 1980) (dealing with a joint venture dispute).

For many of the reasons detailed above, the court finds that the "critical events" which gave rise to Plaintiff's claims occurred in New York.

"To assert jurisdiction based on out-of-state tortious conduct that caused an economic injury, a plaintiff must show that the lost income or revenue would have been derived from in-state activities." *Hamann*, 2017 WL 421646, at *4 (citing to *Greene v. Sha-Na-Na*, 637 F. Supp. 591, 597–98 (D. Conn. 1986)). Plaintiff's alleged lost income or revenue would have been the product of the services that he, and Defendants, would have provided from his partnership based in New York. *See Greene*, 537 F. Supp. at 597 ("Moreover, in evaluating the 'critical events' for the purposes of jurisdiction, the plaintiff's residence of domicile within a state, in and of itself, is not sufficient predicate for the exercise of jurisdiction."). "In short, while there is no question that the plaintiff suffered some harm in Connecticut, it is only in the sense that lost business anywhere in the United States indirectly would affect his income in Connecticut because he is domiciled here." *Id.* at 598.

Therefore, the court also cannot find that Plaintiff adequately has established its personal jurisdiction over Defendants under § 52-59b(a)(3).

## B. Personal Jurisdiction – Due Process Clause

Having found that Connecticut's long-arm statute does not allow the court to exercise personal jurisdiction, the court will assess relevant due process requirements.

"The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Met. Life Ins. Co.*, 84 F.3d at 567. Under the first prong, the court must "determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The key principle driving the sufficient-contact analysis is whether the defendant "purposefully [availed] themselves of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Sherman Assocs. v. Kals*, 899 F. Supp. 868, 871 (D. Conn. 1995) (quoting *Burger King Corp. v. Rudzewics*, 471 U.S. 4632, 475 (1985)). There is a distinction between "specific jurisdiction and general jurisdiction." *Met. Life Ins. Co.*, 84 F.3d at 567 (internal quotations omitted). Specific jurisdiction subjects the defendant to the personal jurisdiction of the court in suits "arising out of or related to the defendant's contact with the court." *Id.* General jurisdiction allows the court to exercise personal jurisdiction even where "the subject matter of the suit is unrelated to the contacts." *Id.* (citing to *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984).

Under the second, reasonableness prong, the court must determine whether the exercise of jurisdiction "comports with 'traditional notions of fair play and substantial justice.'" *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 496 (D. Conn. 2006) (quoting *Burger King Corp.*, 471 U.S. at 475).

Plaintiff does not allege that Defendants' contact with Connecticut extend beyond what is specifically related to his cause of action.  The alleged instances of contact are limited to communications with Plaintiff and the occasions when both Defendants traveled to Connecticut either to solicit business from Connecticut entities or to further discuss the partnership.  See Pl.'s Opp'n 11–12.  This clearly does not rise to the requisite level of contact such that this court can exercise general jurisdiction over Defendants.  See Dunne v. Doyle, No. 3:13-cv-1075(VLB), 2014 WL 3735619, at *11 (D. Conn. July 28, 2014) (citing Helicopteros, 466 U.S. at 416 (1984)); see also Met. Life Ins. Co., 84 F.3d at 568 ("Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test.").  The record does not suggest that conversations or solicitation of business from Connecticut entities ever manifested into revenue.  This falls far short of the "systemic and continuous presence in the forum" which is required for general jurisdiction.  Doyle, 2014 WL 3735619, at *11.

Defendants' conduct likewise does not amount to sufficient contact to satisfy specific jurisdiction.  Plaintiff provides four specific examples of Defendants' contact with Connecticut[4] which the court finds can be further categorized into two groups: 1) communication with Plaintiff regarding the joint venture, and 2) communication with Connecticut entities for potential partnerships.  See Pl.'s Opp'n 11–12.

The first category does not amount to requisite minimum contact because it is clear that Defendants were not seeking "the benefits and protections of the forum's laws." Burger King Corp., 471 U.S. at 376.  The partnership was to be a product of New York

---

[4] Plaintiff raises the following examples: 1) negotiation of partnership or joint venture agreement with a Connecticut resident, 2) phone calls and virtual meetings with Plaintiff while Plaintiff was in Connecticut, 3) travels to Connecticut to further discuss the partnership or joint venture, and 4) meetings with investment firms located in Connecticut.  See Pl.'s Opp'n 11–12.

13

laws, which was most clearly evidenced by retaining a Manhattan-based attorney to increase "efficiency" and to "minimize costs."  See Compl. ¶ 28; Decl. of Golaszewskj ¶ 22 Decl. of Swentzel ¶ 18.  Defendants' ongoing communications with Plaintiff while Plaintiff physically was in Connecticut reflects the technological ease of doing so, rather than Defendants' "deliberate" intent to seek the benefits of the laws of Connecticut.  See Vertrue Inc., 429 F. Supp. 2d at 495–96.  The court also notes that Plaintiff's residence in Connecticut plays only a marginal role in this analysis, because his work—and therefore his ties with Defendants—was built upon Plaintiff's activity in New York.  Plaintiff met Defendants at 17Capital, a New York Company, see Defs.' Mot. 1, and the initial complaint is clear that almost the entirety of the discussions pertaining to their partnership occurred in New York.  See generally Compl. (noting the several places in New York where conversations developed).

The second category of contact, Defendants' alleged solicitation of business from Connecticut entities, falls short of minimal contact not only because the record does not reflect that such solicitation resulted in any "ongoing obligations" with Connecticut, but also because "the defendants' suit-related conduct" did not create substantial connection with the forum state.  Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016).  Defendants' suit-related conduct is the "conduct that could have subjected them to liability."  Id.  In this instance, the conduct in question is not the solicitation of Connecticut business, but rather the alleged conversations regarding the joint venture or partnership.  See Compl. ¶¶ 59–81 (claiming breaches of the partnership or joint venture agreement and a breach of fiduciary duty).  For this reason, the court can exercise neither general nor specific jurisdiction over Defendants.

Further, the court finds that any exercise of jurisdiction in this case "would violate traditional notions of fair play and substantial justice." *Met. Life Ins. Co.*, 84 F.3d at 576. Citing the Supreme Court of the United States, the United States Court of Appeals for the Second Circuit lists five factors to consider during an inquiry such as this: 1) the burden that the exercise of jurisdiction will impose on the defendant; 2) the interest of the forum state in adjudicating the case; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and 5) the shared interest of the states in furthering substantial social policies." *Id.* at 568 (citing *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 113–14 (1987)). Assessment of these factors does not support this court's exercise of personal jurisdiction in the present case. The defendants and many of the key witness either work in or reside in New York. Defs.' Mot. 15–16. Although the court acknowledges Plaintiff's interest in obtaining convenient and effective relief, his ties and proximity to New York (as evidenced by his own work there) suggest that such interest will not be sacrificed by this decision. Additionally, while "Connecticut has a strong and legitimate interest in holding nonresidents accountable" for obligations they assume toward Connecticut residents, *Nusbaum & Parrino, P.C. v. Collazo De Colon*, 618 F. Supp. 2d 156, 163 (D. Conn. 2009), "all other considerations support a finding that this court cannot properly exercise jurisdiction over the individual defendants." *Simonson v. Olejniczak*, No. 3:21-cv-1118(SALM), 2022 WL 6509428, at *12 (D. Conn. May 17, 2022).

### C. Motion to Transfer

In their briefs, each party has moved to transfer this case. *See* Pl.'s Opp'n 14–15 (moving for transfer, should the court fail to find personal jurisdiction); Defs.' Mot. 15–17 (moving to transfer, out of convenience, even if the court finds personal jurisdiction).

Authority to transfer this case can be found in 28 U.S.C. § 1631, which provides (in relevant part) that:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other court . . . in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filled in or noticed for the court from which it is transferred.

Thus, a case must be transferred when 1) the court lacks jurisdiction over it; 2) the receiving court would have had jurisdiction over the case at the time it was filed; and 3) such transfer would be in the interest of justice. *Ruiz v. Mukasey*, 552 F.3d 269, 273 (2d Cir. 2009) (citing to 28 U.S.C. § 1631 and *Paul v. INS*, 348 F.3d 43, 46 (2d Cir. 2003)). Having found a lack of personal jurisdiction, the court assesses the next two conditions. As each party seeks a transfer of this case to the Southern District of New York ("SDNY"), the following analysis contemplates the SDNY as a potential recipient location.

The second condition (that the SDNY would have jurisdiction over this case) is not contested by the parties. *See* Defs.' Mot. 15–17 (arguing that both subject matter and personal jurisdiction are satisfied and that SDNY presents a convenient venue); Pl.'s Opp'n 15–16 (agreeing, implicitly with Defendants' assessment, and arguing that SDNY would "support judicial efficiency"). The court agrees with this assessment. Transfer of this case to the SDNY would not jeopardize diversity jurisdiction, and it would establish

personal jurisdiction over the defendants. The "locus of operative facts" test, under which the court looks to the "site of the events from which the claim arises," dictates that SDNY is a proper forum. *Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C.*, 294 F. Supp. 2d 218, 220 (D. Conn 203) (citing *Distefano v. Carozzi N. Am.*, No. 98-cv-7137(SJ), 2022 WL 31640476, at *3 (E.D.N.Y. Nov. 16, 2002)). As detailed above, the discussion regarding this joint venture began, developed, and terminated in New York.

Finally, the third condition (that the potential transfer would further the interest of justice) also is satisfied. Here, there is no indication or allegation that Plaintiff asserted his claims in bad faith. *See Mukasey*, 552 F. 3d at 276. In weighing "the equities of dismissing a claim when it could be transferred," *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996), the court takes particular note of the Second Circuit's express preference "for resolving disputes on the merits." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005). Although Plaintiff's claim "likely would be timely if filed anew in the district court, a transfer would expedite their review, thereby furthering the interest of justice." *Mukasey*, 552 F.3d at 276 (citing *Liriano*, 95 F.3d at 122–23). Consistent with these principles, the court finds that transferring this case to the SDNY produces a just result.

According to Defendants' Notice of Related Cases, ECF No. 24, there are pending actions related to this case presently before United States District Judge Philip Halpern. Given Judge Halpern's familiarity with the facts of this action, the court orders this case transferred specifically to His Honor.

IV.    **CONCLUSION**

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Defendants' motion is **GRANTED** insofar as it seeks transfer of this case to the Southern District of New York.

2. The court respectfully asks the Clerk of Court to please issue an order transferring this case to Judge Philip Halpern of the Southern District of New York.

**IT IS SO ORDERED** in Hartford, Connecticut, this 13th day of November, 2023.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE